■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KENNETH MAULA, Appellant.—Judgment of the Supreme Court, Bronx County (Ivan Warner, J.), rendered on January 9, 1987, convicting defendant, following a jury trial, of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of from 6 to 18 years, is reversed on the law and the matter remanded for a new trial.

Defendant herein was indicted on August 6, 1986 for murder in the second degree, criminal possession of a weapon in

the second degree and criminal use of a firearm in the second degree as the result of a fatal shooting which occurred on July 18, 1985. The deceased was Dr. Louis DeBellis, a physician who had purchased some real property located on East Tremont Avenue in Bronx County. Defendant was the seller of the parcel of land in question, and, following the transaction, DeBellis and defendant became good friends. However, the relationship between the two men deteriorated rapidly after defendant first agreed to sell DeBellis one half of a building but subsequently refused to go through with the deal. DeBellis thereupon instituted a lawsuit to compel specific performance, and, when the parties were unable to settle their differences, the matter proceeded to trial and judgment, the outcome of which was that defendant was directed to sell the property to DeBellis. Defendant filed a notice of appeal and moved for a stay, which was granted on condition that he file a bond and perfect his appeal by a specified date. All additional settlement discussions were unsuccessful, and, finally, on the day before the bond was due, the dispute erupted into violence. Defendant and DeBellis became embroiled in a heated altercation during which defendant was apparently punched by DeBellis and then threatened by him with further physical injury. In response, defendant removed a loaded gun from the desk in his office and followed DeBellis downstairs to ascertain whether he had left the premises in which defendant's printing business was located. The two men exchanged some more words, and defendant fired three shots at DeBellis, one of which struck the latter, fracturing his spine and perforating the spinal cord. All efforts to revive DeBellis failed.

At the ensuing trial, the arresting officers described defendant as being dazed and incoherent after the shooting, and, indeed, defendant's defense was that he lacked criminal responsibility by reason of mental disease or defect. Dr. Daniel Schwartz, the psychiatric expert who testified on defendant's behalf, stated that at the time of the incident, defendant was suffering from a severe adjustment disorder with anxiety and that this condition significantly impaired his ability to comprehend the consequences of his act or to distinguish the real from the unreal. In the opinion of Dr. Schwartz, because of a childhood eye injury and the attendant loss of his left eye, defendant lived in constant fear of losing the other eye and becoming totally blind. Therefore, when DeBellis had beaten him so severely on the day of the shooting that his glass eye had fallen out and also promised to return and blind him, defendant became so petrified that he ceased to function in a

rational manner. In rebuttal, the People called Dr. John Baer Train who agreed that defendant had suffered from an adjustment disorder on July 18, 1985 but, nonetheless, concluded that defendant had possessed the capacity to appreciate the nature and consequences of his act, as well as its wrongfulness. Both psychiatrists concurred that defendant was not psychotic.

In convicting defendant of manslaughter in the first degree, the jury rejected defendant's claim of lack of criminal responsibility on the ground of mental disease or defect. On appeal, defendant argues, in part, that the trial court committed reversible error in failing to deliver an instruction to the jury, despite being requested to do so, which is required by CPL 60.55. According to this provision: "Any statement made by the defendant to a psychiatrist or licensed psychologist during his examination of the defendant shall be inadmissible in evidence on any issue other than that of the affirmative defense of lack of criminal responsibility, by reason of mental disease or defect. The statement shall, however, be admissible upon the issue of the affirmative defense of lack of criminal responsibility by reason of mental disease or defect, whether or not it would otherwise be deemed a privileged communication. Upon receiving the statement in evidence, the court must instruct the jury that the statement is to be considered only on the issue of such affirmative defense and may not be considered by it in its determination of whether the defendant committed the act constituting the crime charged."

The People contend that the court did not improperly decline to give a mandated charge since defense counsel did not ask for the statutory instruction but, rather, one contained in a textbook indicating that such an instruction might be appropriate in some circumstances. In that regard, the People urge that the failure of defense counsel to refer specifically to the statutory provision is fatal to defendant's position. The reason for this, the prosecution asserts, is that when defendant's attorney requested the charge he did so on the basis of the inculpatory nature of defendant's statements to the psychiatrists and not because of the requirement of section 60.55 (2) and the constitutional protection against self-incrimination. Where a litigant on appeal claims that a trial error has occurred, the People argue, he must advance a theory that was raised at trial. Consequently, defendant has not preserved for appellate review his objection to the court's failure to give the instruction in question. The People, moreover, point to the slight variation between the statutory

language and that of the charge demanded by defense counsel —section 60.55 (2) provides that the psychiatric testimony may not be considered by the jury in its determination of whether defendant committed "the act constituting the crime charged" while the textbook charge employs the phrase whether the defendant "committed the crime charged." Finally, the prosecution contends that even should this court decide that defendant properly preserved the issue for appeal and that the trial court should have charged the jury in the proposed manner, the error was harmless. In view of the prosecution, the evidence of defendant's guilt was overwhelming; defendant conceded that he had shot DeBellis; he had not met his burden of demonstrating his mental incapacity on July 18, 1985; and there is no likelihood that, but for the alleged error, the jury's verdict would have been other than what it was.

However, an examination of the wording of CPL 60.55 (2) clearly shows that this provision contains a mandatory directive—"the court *must* instruct the jury" (emphasis added). The direction, further, is not conditional upon defendant's request that it be delivered; the statute obligates the trial court to charge the jury that the statement made by a defendant to a psychiatrist during his examination is to be considered only on the issue of the affirmative defense and not with respect to whether the defendant committed the act constituting the crime charged. Failure by the court to comply with a statutory mandate presents an issue of law for appellate review even where counsel may have consented to the procedure *(People v Mehmedi,* 69 NY2d 759, 760; *see also, People v Ahmed,* 66 NY2d 307, 310). In the instant situation, defendant's lawyer did not, of course, agree. Counsel specifically asked for the charge, and it is irrelevant that he did not cite the statutory provision or that the language in the requested instruction varied slightly from the words used in CPL 60.55 (2). Further, since the trial court was required to follow the statutory directive, the court's refusal to give the charge herein cannot be deemed harmless error *(see, People v Owens,* 69 NY2d 585, 591).

Compounding the error which occurred here is that in the absence of the limiting instruction, the jury very likely did, in fact, consider the psychiatric testimony as proof of the underlying offenses charged against defendant. The reason for this is that defendant's account at trial was at variance in certain significant respects from Dr. Schwartz's testimony concerning his conversations with the former. Thus, at the trial, defen-

dant exhibited lapses in memory. He could not, for example, recall removing the weapon from his desk and loading it; he saw faces which he did not recognize (the faces belonged to two of defendant's employees) and didn't remember much of anything until he stood on the porch with the gun in his hand, calling to DeBellis not to return. Indeed, his recollection of the circumstances surrounding the shooting was rather hazy, although he did admit to firing his weapon three times in quick succession and observing the deceased stumble and fall down into his car. Dr. Schwartz, on the contrary, indicated that defendant might have been more aware of what was happening at the time of the incident than he acknowledged at trial. According to Dr. Schwartz, defendant had stated that after he was beaten by DeBellis:

"Mr. Maula told me at this point the implant was half out, he could feel blood, he thought he was hemorrhaging. He kept thinking that his assailant was coming back. 'I can't take another beating. I don't know how I'm going to stop this man.'

"At this point he went for his gun. He told me that he had a gun in a holster in his desk, in his office, in his building in the Bronx; that he had bought this gun some three or four years earlier for his own protection.

"He now took the gun, he said, and he went downstairs to stop Dr. DeBellis from coming back."

It is evident that to the extent that defendant's memory was clearer during his private interviews with Dr. Schwartz than it was when he was on the stand (at the psychiatric interviews, he did recall getting his gun), the statements made by defendant were certainly inculpatory. A limiting charge to the jury that these statements were not admissible for purposes of determining whether he had committed the crimes of which he was accused was, therefore, imperative. Finally, it should be noted that it was also error to permit the prosecutor to interrogate defendant regarding an alleged prior incident. Not only was information concerning this matter obtained as a direct result of defendant's examination by the People's psychiatrist and then used by the District Attorney to attack defendant's credibility, which was improper in itself, but the prosecution was allowed to question defendant without first ascertaining whether there was a factual basis for the prior purported misconduct and without the court delivering any instruction to the jury as to how this testimony could be viewed. At any rate, the incident was simply too remote in time to be probative of defendant's credibility, and the possi-

bility of prejudice to defendant was so high as to outweigh any evidentiary value *(see, People v Sandoval,* 34 NY2d 371). Concur—Kupferman, J. P., Ross, Asch and Milonas, JJ.

Sullivan, J., concurs in a memorandum as follows: To the extent that the majority finds that the failure to charge CPL 60.55 (2) on request is per se error requiring reversal, I cannot agree. In the circumstances of this case, however, I believe the failure so to charge constitutes reversible error.